FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jan 27, 2026

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| SCOTT T.,[1] <br><br> Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, <br> Commissioner of Social Security, <br><br> Defendant. | No.  2:25-cv-197-EFS <br><br> **ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR MORE PROCEEDINGS** |

Plaintiff Scott T., who suffers from autoimmune disorders and other impairments, asks the Court to reverse the Administrative Law Judge's (ALJ) denial of Title 2 benefits. Because the ALJ erred when evaluating Plaintiff's symptom claims and a treating provider's

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." See LCivR 5.2(c).

DISPOSITIVE ORDER - 1

opinions, this matter is remanded for further proceedings, including a consultative physical examination.

## I.     Background[2]

The medical records reflect that Plaintiff sought treatment for a variety of issues prior to and during the alleged disability period, beginning July 31, 2020, and that medication and other treatments helped reduce inflammation but did not reduce all of Plaintiff's symptoms. One of the first treatment notes of record is from September 2019 when Plaintiff complained of chronic headaches, and the MRI showed stable bilateral basal ganglia calcifications.[3] In December 2019, Plaintiff was referred to physical therapy by his treating provider PA-C Zachary Stiles for his daily fatigue and malaise.[4]

The intake notes for physical therapy completed by the naturopathic doctor, Chris Valley, ND, reflect the following history:

---

[2] The Background's summary of medical records focuses on Plaintiff's physical-health medical records.

[3] AR 691–93, 753–54.

[4] AR 424–34.

a 47-year-old male who comes in for evaluation and treatment of myalgias and arthralgias. He was initially seen in this clinic in April 2010 for migratory arthritis. His presentation suggested palindromic rheumatism. The symptoms began abruptly and would last for one to 3 days before resolving spontaneously. Between the episodes, he was free of joint pain. His serology showed elevated RF IgA (319), RF IgM (197) and CCP antibody (+100). At that time, he was started on hydroxychloroquine and colchicine, which he discontinued within the first several weeks of taking. He later restarted hydroxychloroquine and try to titrate up the dose. In August 2018, he developed sharp pain in the biceps and thighs. He noted burning discomfort in his extremities. He had a sense of weakness. It was difficult for him to open jars. Laboratory studies revealed a CK of 353. He discontinued hydroxychloroquine. In October 2018, EMG and nerve conduction studies were normal without evidence of neuropathy or myopathy.

My first visit with this 47-year-old male referred to me by Dr. [Jeffrey] Butler to discuss complementary evaluation in the setting of inflammatory arthritis. Patient was last seen with Dr. Butler on November 7. He was apparently not tolerating methotrexate well noting significant fatigue. Dr. Butler discontinued the drug in favor of leflunomide. He then contacted the office shortly thereafter reporting increased symptoms of tremor as well as increasing headaches. Leflunomide was discontinued and he was restarted on methotrexate 25 mg oral weekly with folic acid 1 mg. He states that he was previously on hydroxychloroquine and per his report at full dosage 400 mg noted increasing severe weakness of his extremities. As stated above EMG studies were normal. Other biologic agents have been discussed as alternatives in the future.

Patient describes a chronic deep aching and burning pain diffusely in his neck and upper back. No focal radiculopathy. He states that he has always noted trigger

DISPOSITIVE ORDER - 3

points in his upper back. The patient often describes a sense of "heat" in his back. He has tried some different complementary treatment including working with another naturopath in Spokane trying various dietary supplements and "detox" methods.

He continues to struggle with daily fatigue and malaise. The patient denies hypersomnia. Laboratory testing has not shown any other causes of his fatigue, normal thyroid studies.[5]

Plaintiff began physical therapy, which focused on his neck and upper back; during which he was observed with generalized hypomobility and weakness of cervical stabilizers.[6] During May through July 2020, he continued to report internal tremors in his neck and torso and increased rheumatoid arthritis flairs, and he was observed as depressed and frustrated with medical conditions.[7]

On July 9, 2020, Plaintiff returned to Dr. Valley. Plaintiff reported that his arthritis symptoms were doing "quite well," he reported three-day improvement in tremor symptoms after taking a

---

[5] AR 424.

[6] AR 433–53.

[7] AR 1214–17, 462–65, 666.

natural supplement.[8] However, he reported that he still had muscle pain, stiffness, and fatigue if he tried vigorous exercise, although he was able to tolerate his work activities.[9] Dr. Valley's assessment was that Plaintiff had no acute joint pain or swelling to suggest active palindromic rheumatism and that he responded favorably to methotrexate, but that Plaintiff "has had very vexing neurological symptoms including dysesthesias and tremors" and that while Plaintiff reported he responded well to a supplement Dr. Valley cautioned him about the use of supplements.[10]

The next day Plaintiff saw PA-C Stiles for ongoing myalgias, muscle weakness, and nerve pain.[11] Plaintiff's musculoskeletal findings were normal other than decreased upper extremity strength on the left

---

[8] AR 986.

[9] AR 986–90.

[10] AR 989.

[11] AR 660–64.

DISPOSITIVE ORDER - 5

side.[12] PA-C Stiles referred him to neurology and began him on a prednisone taper.

On July 18, 2020, Plaintiff sought emergency treatment for head fog and pressure and reported that his arm muscles hurt and he had weakness in his hands.[13] He was observed with a very fine hand tremor and very mild fine tongue tremor.[14] His labs were normal except his erythrocyte sedimentation rate ("sed rate" or "ESR"), was mildly elevated, "suggesting a possible inflammatory response," and his thyroid-stimulating hormone (TSH) was low.[15] It was assessed that some of his symptoms were consistent with hyperthyroidism.

---

[12] AR 664.

[13] AR 684–86.

[14] AR 686.

[15] AR 688. Sed rate is a blood test that can show inflammatory activity in the body. https://www.mayoclinic.org/tests-procedures/sed-rate/about/pac-20384797 (last viewed January 26, 2026).

DISPOSITIVE ORDER - 6

At a follow-up two days later with PA-C Cody Solders, Plaintiff continued to be frustrated with his internal tremors and myalgia.[16] In August 2020, Plaintiff began acupuncture treatments and he reported that his internal tremors and burning became less intense, however, insurance stopped acupuncture coverage.[17] Labs continued to show a high sed rate.[18]

Plaintiff saw rheumatologist Dr. Butler again, who referred him to several specialists, including to cardiology, which revealed a normal EKG; to endocrinology, which assessed Plaintiff with hyperthyroidism; and to audiology, which revealed bilateral normal to moderate sensorineural hearing loss and age-related bilateral cataracts.[19] When Plaintiff saw PA-C Stiles in October 2020, he was "distraught," tearful, and reported that he felt "like he is falling part" and "has burning all

---

[16] AR 654–67.

[17] AR 472–77.

[18] AR 919.

[19] AR 675–84, 821–29, 1119–22, 1165–69.

DISPOSITIVE ORDER - 7

throughout his body.[20] PA-C Stiles wrote, "I had a very frank discussion with him that I think his symptoms could all be explained by his autoimmune process," as Plaintiff "has a known autoimmune disease with a very high titer for double-stranded DNA."[21] The labs taken the week prior revealed that Plaintiff's ANA-A, ANA-B, SS-DNA, DS-DNA, RF IgA, RF IgM, RF IgG, and sed rate were all high.[22]

In October 2020, based on a referral by PA-C Stiles, Plaintiff was seen at UW Neurology Clinic for his reported muscle weakness and tremor.[23] His observed muscle strength and tone were normal, he had sharp-dull discrimination decreased below the knee but intact sensation at the toes on the pinprick, decreased temperature below the knee but intact at the feet, a slight postural tremor with outstretched hands, and normal gait. The doctor stated:

> [u]nfortunately, we are not able to put together his [history], [physical examination] and testing to come up

---

[20] AR 633–34.

[21] AR 633.

[22] AR 959–60.

[23] AR 493–97.

with a neurological issue. Temporally, his symptoms started after increasing the hydroxychloroquine. But not clear if cause and effect. Consider stopping. We would not recommend further neurological testing or work-up at this time and defer further treatment to the primary care and rheumatologist.[24]

In November 2020, Plaintiff returned to PA-C Stiles.[25] Plaintiff was "very tearful in the office," and while he reported that the prednisone taper helped with his pain, he advised that he still was not able to work due to his pain.[26] Prior to this, Plaintiff had worked in environmental cleanup services for many years.[27] PA-C Stiles referred Plaintiff to a new rheumatology clinic to help address his polyarthritis flare-up.[28] Although Plaintiff's musculoskeletal physical exam was normal, PA-C Stiles wrote, "I think he would need to have some sort of permanent treatment on board [before he returns back to work],

---

[24] AR 497.

[25] AR 627–29.

[26] AR 627.

[27] AR 248–54, 402, 520.

[28] AR 628.

1  whether that is some sort of other [disease-modifying antirheumatic

2  drug] or something else."[29]

3      At the appointment the next week, PA-C Stiles assessed that

4  Plaintiff's reports for internal shaking may be due to being on

5  prednisone for an extended time and emphasized the need for him to

6  get into rheumatology as "I feel pretty confident that this is most likely

7  due to his rheumatological disorder and possibly due to being on the

8  [p]rednisone for an extended period of time."[30] Hyporeflexia was

9  present on the physical examination.[31]

10     In December 2020, he was restarted on Propranolol and

11 Plaquenil, and re-met with PA-C Stiles to discuss sleep study results,

12 which showed moderate sleep apnea.[32] PA-C Stiles wrote, "He is feeling

---

16 [29] AR 628.

17 [30] AR 622.

18 [31] AR 622.

19 [32] AR 605–08.

very run down and at the end of his rope. He is very frustrated by his illness and not being able to get it under control."[33]

In February 2021, Plaintiff returned to Dr. Butler, continuing to report morning stiffness of variable duration, widespread arthralgias, pain in his wrist predominantly on the right side, and diffuse soft tissue pain as well as forearm discomfort.[34] Dr. Butler wrote,

> The patient has serologies highly suggestive of rheumatoid arthritis with high titer positive rheumatoid factor and anti-CCP antibodies. He has had some arthralgias with migratory symptoms suggestive of palindromic rheumatism. He does have somewhat poorly defined symptoms with neurological qualities. He has noted some benefit from the combination of methotrexate and hydroxychloroquine but he remains symptomatic. His primary concerns are symptoms which do not correlate with active rheumatoid arthritis. We discussed that we do have other treatment options that he may consider.
>
> I would be hesitant to recommend a TNF inhibitor. The patient does show serologies suggesting a possible overlapping connective tissue disease. He has had high titer positive ANA with borderline positive double-stranded DNA antibodies. I am concerned that a TNF inhibitor potentially could aggravate symptoms of connective tissue disease. We discussed the option of B-cell depleting therapy such as rituximab. The patient does plan to pursue COVID-19

---

[33] AR 606.

[34] AR 924.

> vaccination. Rituximab could interfere with his ability to mount an appropriate immune response to the vaccination. Therefore, I would recommend deferring treatment with rituximab.[35]

Dr. Butler also considered that "a mood disorder could be contributing somewhat to his [depressed] presentation."[36]

At his follow-up sleep apnea visit in February 2021, Plaintiff appeared tired, with mildly dysphoric mood and blunted affect; was frustrated with medical concerns and weakness, with slight wasting of wrist extensors and hands with weakness bilaterally for wrist extension worse on right; and reported pain with wrist movement. [37] He had a mild intention tremor bilaterally with finger to nose.

In late February 2021, Plaintiff presented to rheumatologist Yan Li, MD, for a consultation for his migratory joint pain, morning stiffness, persistent burning sensation in extremities, muscle shaking,

---

[35] AR 926.

[36] AR 928.

[37] AR 500–03.

fatigue, and frequent cough.[38] He presented with grossly intact upper and lower extremity strength, with swelling and tenderness in right 4th MTP, 4th PIP, left 2nd and 3rd PIP joints, and bilateral wrists.[39] The labs from that month showed a positive ANA, SS-DNA, chromatin, and RF, and high sed rate levels.[40] Dr. Li determined that Plaintiff's "clinical presentations are suggestive [of] inflammatory arthritis, likely early onset rheumatoid arthritis. Given the inadequate response to methotrexate and Plaquenil, biologic agent is suggested at this time."[41] Dr. Li recommended a chest x-ray for Plaintiff's frequent cough.[42] The ordered CT imaging of the chest revealed bilateral lower lobe predominant ground-glass opacities with likely NSIP pattern, suggesting connective tissue disease-related disease.[43] It was

---

[38] AR 526–29.

[39] AR 528.

[40] AR 528, 913–18, 1012.

[41] AR 528.

[42] AR 529.

[43] AR 522.

1    recommended that his immunosuppression therapy be increased, with

2    rituximab as an option.[44] Imaging of the spine showed moderate

3    degenerative disc disease of the spine at C6–7.[45]

4          In March 2021, Plaintiff sought a formal evaluation via a televisit

5    with a Mayo Clinic neurologist.[46] The neurologist stated:

> It is difficult to attribute these symptoms [of generalized
> muscle weakness, intermittent burning/crawling sensations
> throughout the body but primarily bilateral lower
> extremities and internal tremor] to a neurologic cause or
> localizable to one location . . . [I]t is unlikely we will find
> any pathology as patient's symptoms do not fit a neurologic
> pattern at this time. Another possibility on the differential
> is a side effects from the Plaquenil which has shown to
> cause a sensorimotor neuromyopathy.[47]

Plaintiff began Rituxan (rituximab) infusion therapy to help reduce

inflammation, which assisted greatly with reducing his cough and

increasing his exercise capacity.[48]

---

[44] AR 522.

[45] AR 567.

[46] AR 519–21.

[47] AR 521.

[48] AR 518, 791, 809, 79–79.

In April 2021, Plaintiff was evaluated in person by the same Mayo Clinic neurologist.[49] The neurological exam was normal. The neurologist concluded there were no neurological causes for the reported symptoms and opined that they could be attributed to anxiety/stress.[50]

Plaintiff returned to PA-C Stiles in May 2021.[51] PA-C Stiles commented that a CT scan showed severe pulmonary fibrosis and so a referral to pulmonology was made; in addition, a referral for physical therapy was done due to Plaintiff's "pretty severe deconditioning with muscle weakness," although Plaintiff exhibited normal strength during the physical examination.[52]

During the physical-therapy evaluation, Plaintiff was observed with 4/5 lower extremity strength with bilateral hip flexion, 4+/5 bilateral hip extensions and abductions, 4+5/5 bilateral knee flexors,

---

[49] AR 515–17.

[50] AR 517.

[51] AR 596–601.

[52] AR 600.

and a slight tremor when lifting and holding objects with bilateral upper extremities.[53] Based on testing performed, the physical therapist assessed fatigue, impaired balance, and nerve pain.[54]

Two days after this evaluation in June 2021, Plaintiff applied for benefits under Title 2, claiming disability beginning July 31, 2020, at the age of 48, based on physical and mental impairments.[55]

At an appointment in July 2021, Plaintiff advised that he had done some strenuous hiking and swimming the day prior and now felt fatigued and was observed with slightly tender joints.[56] Dr. Butler encouraged continued rituximab infusions to treat Plaintiff's rheumatoid arthritis and rheumatoid lung disease.[57] He reduced

---

[53] AR 1061–62, 794–97.

[54] AR 797.

[55] AR 250–54.

[56] AR 900–04.

[57] AR 893, 885, 902–03.

Plaintiff's methotrexate in hopes of reducing Plaintiff's nausea and malaise.[58] Plaintiff's sed rate was in the mid-high range of normal.[59]

At a pulmonary appointment later that month, Plaintiff performed a 6-minute walk test, which he was able to walk 1525 feet (or 464 meters).[60] Plaintiff continued physical therapy through August 2021 during which he demonstrated quick fatigue of scapular retraction with some moves, shaking in his back muscles during other exercises, and balance impairments which were significantly amplified when vision and somatosensory systems were deprived.[61]

Plaintiff's labs in September 2021 revealed a high sed rate.[62] In November 2021, Plaintiff told Dr. Butler that his pain had improved

---

[58] AR 903–04.

[59] AR 1141.

[60] AR 793. *Compare with* https://www.neuropt.org/docs/default-source/cpgs/core-outcome-measures/6mwt-pocket-guide-proof9.pdf?sfvrsn=9ee25043_0 (last viewed Jan. 26, 2026).

[61] AR 779–90, 814–19, 1078–86, 1092–96.

[62] AR 888, 1139.

although he still had daily fatigue and chronic sinus congestion, and he was concerned about the black mold in his residence.[63] Dr. Butler noted that Plaintiff was no longer taking methotrexate due to the side effects of nausea and malaise.[64] Plaintiff was observed with full muscle strength and no tenderness or swelling in all extremities and his sed rates were at the high end of the normal range.[65]

In December 2021, Plaintiff sought emergency room treatment for lower extremity burning, constant fatigue, light sensitivity, and abdominal pain.[66] Based on the benign physical examination, the provider recommended he follow-up with an allergist/immunologist.

In early January 2022, labs showed high levels of ANA, SS-A, AbIgM, AbIgG, and Rh factor.[67] Later that month, Plaintiff had a consultation with Dr. Valley. Dr. Valley wondered whether Plaintiff's

---

[63] AR 1312–20.

[64] AR 1313.

[65] AR 1316–17, 1138.

[66] AR 1282–87.

[67] AR 1199.

tremors were caused by small fiber polyneuropathy or a somatoform disorder.[68]

During an epilepsy consultation in February 2022, the doctor observed slightly slowed foot tapping with no decrement, very mild tremor on the right hand, a trace deep tendon reflex at the biceps and triceps, decreased left great toe pinprick sensation, and mild difficulty standing on heels and toes.[69] The doctor advised Plaintiff that his muscle strength was normal, and his sed rate was normal at 6, and therefore the doctor doubted that there was an underlying myopathy but instead wondered whether the Plaquenil medication used to treat Plaintiff's autoimmune diseases was causing the experienced myalgias.[70]

Biopsies taken during a dermatology appointment in March 2022 were consistent with small fiber neuropathy.[71] The dermatologist

_____

[68] AR 1361.

[69] AR 1409–10.

[70] AR 1410, 1520–23.

[71] AR 1489–90, 1560–61.

advised that the condition could be treated with selective serotonin reuptake inhibiters (SSRIs).[72] Imaging that month confirmed mild diffuse lung disease.[73]

In April 2022, Plaintiff saw both PA-C Stiles and Dr. Butler. Although the physical examination was normal, PA-C Stiles diagnosed Plaintiff with small fiber neuropathy, mixed connective tissue disease, and rheumatoid arthritis with rheumatoid factor of multiple sites without organ or system involvement, and wrote:

> Certainly, with the incredibly extensive workup that he has had in regards to his rheumatological condition and his fatigue and disability, I think he is more than qualified to be considered disabled and unable to work at this time. He will continue to follow up with all his specialists. I filled out his note for him and he will follow up with us as needed.[74]

Three days later, Dr. Butler observed Plaintiff with mild macular erythema over the cheeks and noted that labs from February showed positive SS-A antibodies at 83 units but negative SS-B antibodies and

---

[72] AR 1489.

[73] AR 1558–59.

[74] AR 1621.

negative double-stranded DNA antibodies.[75] Plaintiff's sed rate from his early April 2022 specimen was in the mid-high range of normal, and his sed rate from a late April 2022 specimen was at the high end of normal.[76]

A week later, Plaintiff visited neurologist Steven Pugh, MD, who concluded that Plaintiff may have a somatoform disorder causing his symptoms of pain, paresthesia, burning, and vibration.[77] Dr. Pugh wrote that in his "experience with this type of disorder . . . [it] is very difficult for these patients to have any closure with their ongoing symptoms."[78] Plaintiff again saw Dr. Pugh in July 2022, at which time Plaintiff was "very dysphoric, very anxious."[79] Dr. Pugh wrote, "[b]ased on what I am seeing the degree of his anxiety surrounding his condition is so extreme that I do not see how he could ever possibly

---

[75] AR 1651–55.

[76] AR 1644–45.

[77] AR 1633.

[78] AR 1633.

[79] AR 1635.

work and that may be a primary disorder of his as well."[80] He

reiterated to Plaintiff that his central nervous system was intact.[81]

A couple days later, Plaintiff saw PA-C Stiles and they discussed

his current medications.[82] Plaintiff reported about three good days per

week when he did not have muscle fatigability and internal tremors.

Even though the physical exam findings were unremarkable that day,

PA-C Stiles wrote:

> I discussed that with all of his laboratory findings showing
> significant autoimmune processes that I would certainly
> support any disability claim that he may have. He typically
> always presents as a healthy individual but his laboratory
> workup would seem to show otherwise and some of his
> medications that he is on certainly could lend themselves to
> very easy fatigability.[83]

Later in July 2022, Plaintiff was observed with occasional

expiratory wheeze, decreased range of motion with tenderness along

―――――――――――――

[80] AR 1635.

[81] AR 1635.

[82] AR 1605–10.

[83] AR 1608.

the C2-S1 areas, and positive joint tenderness with swelling.[84] His sed rate was in the normal range.[85] In September 2022, Dr. Pugh observed that Plaintiff's anxiety levels seemed lower with Lyrica.[86] An examination in October 2022 indicated moderate bilateral sensorineural loss.[87] Plaintiff's labs in October 2022 were in the normal range for IgA, IgG, IgM, and sed rate.[88]

In April 2023, Plaintiff returned to PA-C Stiles.[89] Plaintiff reported continued fatigue, he discontinued Lyrica because it increased his GERD, and he continued to be very frustrated that he did not have a clear answer or treatment for his autoimmune disorder.[90] They discussed Plaintiff's lab results, which showed he had a positive

---

[84] AR 1694–1702.

[85] AR 1642.

[86] AR 1704.

[87] AR 1709.

[88] AR 1716.

[89] AR 1947–53.

[90] AR 1947–53.

1 Sjogren's antibody test.[91] PA-C Stiles restarted Plaintiff on Duloxetine

2 and more labs were ordered.[92]

3    A week later Plaintiff saw PA-C Cox for his internal shakiness,

4 myalgias, and arthralgia.[93] PA-C Cox wrote that Plaintiff's rheumatoid

5 arthritis seems to be responding well to the current medications and he

6 did not have joint swelling or warmth, but that Plaintiff continued to

7 "endorse abnormal vibratory sensations, decreased strength in his

8 calves and forearms, and abnormal temperature sensations" as well as

9 fatigue.[94]

10    May 2023 imaging revealed fairly stable patchy bibasal opacities

11 with nodular component in Plaintiff's lungs, which were "likely from

12 chronic inflammatory process."[95] In September 2023, Plaintiff sought

13 treatment from PA-C Stiles for reported difficulty breathing due to

14 _____

15 [91] AR 1951.

16 [92] AR 1951–52.

17 [93] AR 1742–48.

18 [94] AR 1747.

19 [95] AR 1832.

recent smoke in the air.[96] PA-C Stiles assessed interstitial lung disease with progressive fibrotic phenotype and recommended nebulizer treatments.[97] Plaintiff's lab specimen collected in October 2023 showed high sed rate levels.[98]

In January 2024, ALJ Marie Palachuk held a telephone hearing at Plaintiff's request, following the initial denial of Plaintiff's disability claim.[99] Plaintiff testified that he had difficulty sleeping, internal shaking, severe fatigue, intermittent shortness of breath, balance issues, and pain in his joints, particularly in his wrists, and he can start shaking or experience muscle paralysis if he performs repetitive motions.[100] Plaintiff stated that during his last years working he missed quite a bit of work due to his symptoms.[101] He stated that the

---

[96] AR 1924–29.

[97] AR 1927–28.

[98] AR 1977–78.

[99] AR 40–69.

[100] AR 48–49.

[101] AR 48–49.

infusion treatments and immune suppressants have helped significantly with his pain, ability to walk, and coughing but that he still has issues with repetitive motion and extreme fatigue.[102] He testified that he still has muscle strength but that repetitive muscle movement causes his muscles to shake and then he is unable to lift.[103] He stated that he has good days when he is able to do things and then he has bad days about 2–3 times a week during which he is so fatigued that he may have difficulty getting out of bed, is unable to walk far, has to use the toilet several times, and usually sits and reads or watches TV.[104] He stated that regardless of whether it's a good day or a bad day he must usually nap.[105] Plaintiff shared that it takes him longer to accomplish household and yard chores because he needs to take breaks.[106] He stated that after he initially started rheumatological

---

[102] AR 50–51.

[103] AR 51.

[104] AR 51, 57–58.

[105] AR 57–58.

[106] AR 52.

infusions he was able to do more physically, including walking 4–5 miles; however, after the second infusion, he began experiencing injuries if he exercised and he was forced to do less.[107] He stated that he can stand about an hour a day and then he gets dizzy.[108] He testified that after an infusion he will experience nerve pain throughout his entire body and he must be careful about what he eats.[109] He stated that through treatment and an anti-inflammatory diet he has been able to get his inflammatory numbers down but his disease activity numbers are still high.[110]

The vocational expert testified the following limitations would be work preclusive: needing to take a break every 30 minutes, being off task more than 10 percent of the workday, and being absent 2 or more days a month for 3 months in a row.[111]

---

[107] AR 53–54.

[108] AR 54.

[109] AR 54–55.

[110] AR 55.

[111] AR 65–66.

After the hearing, the ALJ issued a decision denying benefits.[112] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with the medical evidence and other evidence,[113] and found:

- the psychiatric consultative opinion of Patrick Metoyer, PhD, and the administrative findings of Mark Magdaleno, MD, Dennis Pacl, MD, and Beth Fitterer, MD, persuasive; and

- the administrative findings of Patricia Kraft, PhD, the treating opinions of Zachary Stiles, PA-C, and the psychological consultative opinion of Melvin Watt, PhD, not persuasive.[114]

As to the sequential disability analysis, the ALJ found:

- Plaintiff met the insured status requirements through December 31, 2025.

- Step one: Plaintiff had not engaged in substantial gainful activity since July 31, 2020, the alleged onset date.

---

[112] AR 14–39. Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[113] AR 23.

[114] AR 17–29. The ALJ referred to Dr. Pacl as Dr. Paci.

- Step two: Plaintiff had the following medically determinable severe impairments: systemic lupus erythematous, small fiber neuropathy, rheumatoid arthritis with no organ or system involvement, hearing loss, anxiety, depression, and post-traumatic stress disorder.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform light work except:

  he can never climb ladders, ropes, or scaffolds, but occasionally perform all other postural activities, should avoid concentrated exposure to extreme temperatures, noise, and vibration, and all exposure to hazards such as unprotected heights and dangerous, moving machinery. He is able to understand, remember, and carry out simple, routine, and detailed tasks and able to maintain concentration, persistence, and pace for 2-hour intervals between regularly scheduled breaks. He is limited to no assembly line pace or similarly fast-paced work, and superficial interaction with the public.

- Step four: Plaintiff is unable to perform past relevant work.

- Step five: considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant

DISPOSITIVE ORDER - 29

numbers in the national economy, such as telephone directory distribution driver, lab sample carrier, and car driver.[115]

Plaintiff timely requested review of the ALJ's decision by the Appeals Council and now this Court.[116]

## II.    Standard of Review

The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error" and such error impacted the nondisability determination.[117] Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

---

[115] AR 17–30.

[116] AR 1–6; ECF No. 1.

[117] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g); *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a).

support a conclusion."[118] The court looks to the entire record to determine if substantial evidence supports the ALJ's findings.[119]

### III.   Analysis

Plaintiff argues the ALJ erred by rejecting the work-preclusive assessment from treating provider PA-C Stiles and by discounting Plaintiff's symptom testimony. The Commissioner argues no error occurred, as the ALJ's findings are supported by substantial evidence. As is explained below, the ALJ consequentially erred when evaluating PA-C Stiles' opinion and therefore remand for further proceedings is needed.

_____

[118] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)).

[119] *Kaufmann v. Kijakazi*, 32 F4th 843, 851 (9th Cir. 2022). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (requiring the court to consider the entire record, not simply the evidence cited by the ALJ or the parties) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

1  **A.    Medical Opinions: Plaintiff establishes consequential**

2       **error.**

3       Plaintiff argues the ALJ's supportability and consistency

4  evaluation of PA-C Stiles was flawed. The Court agrees.

5       1.    <u>Standard</u>

6       The ALJ must consider and articulate how persuasive she found

7  each medical opinion and prior administrative medical finding,

8  including whether the medical opinion or finding was consistent with

9  and supported by the record.[120] This persuasiveness evaluation

10  requires require the ALJ to explain the supportability and consistency

11  of each medical opinion.[121] The regulations define these two required

12  factors as follows:

13       (1) Supportability. The more relevant the objective medical
         evidence and supporting explanations presented by a
14       medical source are to support his or her medical opinion(s)
         or prior administrative medical finding(s), the more
15       persuasive the medical opinions or prior administrative
         medical finding(s) will be.

16  _____

17  [120] 20 C.F.R. § 404.1520c(a)–(c); *Woods v. Kijakazi*, 32 F.4th 785, 792

18  (9th Cir. 2022).

19  [121] 20 C.F.R. § 404.1520c(b)(2).

> (2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[122]

The ALJ may, but is not required to, explain how the other listed factors were considered, including relationship with the claimant and specialization.[123]

When considering the ALJ's findings, the Court is constrained to the reasons and supporting explanation offered by the ALJ.[124]

### 2.    PA-C Stiles

As mentioned above, PA-C Stiles began treating Plaintiff before the alleged onset date and continued to treat him. PA-C Stiles issued three "opinions" that the ALJ evaluated. First, in April 2022, PA-C Stiles certified for purposes of obtaining a county property tax exemption for Plaintiff that Plaintiff became disabled on January 7,

---

[122] *Id.* § 404.1520c(c)(1)–(2).

[123] *Id.* § 404.1520c(b)(2), (3), (c)(1)–(5).

[124] *See Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

2020, and would continue to be disabled through at least January 7, 2025.[125]

Second, in September 2023, PA-C Stiles completed a Physical Medical Source Statement, listing Plaintiff's diagnoses as rheumatoid arthritis, mixed connective tissue disorder, neuropathy, Sjogren's, small fiber neuropathy, and interstitial lung disease.[126] He wrote that Plaintiff has muscle weakness, easy fatiguability, stiffness, shortness of breath, poor memory, and tremors, and it is easy to exacerbate the global pain that affects Plaintiff's joints and muscles.[127] He stated that he based his findings on labs, physical examination findings, consultations, and imaging studies.[128] He also noted that immunosuppressant medications can cause Plaintiff to be more prone to infections and increased fatigue.[129] He opined that emotional factors,

---

[125] AR 1580.

[126] AR 1962–65.

[127] AR 1962.

[128] AR 1962.

[129] AR 1962.

including depression and anxiety, contribute to Plaintiff's symptoms and functional limitations.[130] He also opined that Plaintiff can walk 1–2 city blocks, sit for 30 minutes at one time for a total of less than 2 hours each workday, and stand for 15 minutes at one time for a total of less than 2 hours each workday.[131] He listed that Plaintiff needs a job that allows him to shift positions at will and have unscheduled 5-minute breaks every 30 minutes due to his muscle weakness, chronic fatigue, pain/paresthesia, and numbness.[132] He further opined that Plaintiff should rarely be required to lift/carry, crouch/squat, and climb ladders and only occasionally twist and stoop.[133] He recommended that Plaintiff be limited to grasping, manipulating, and reaching for only 10% of the workday.[134] He opined that Plaintiff would be off task more than 25% of the workday, was incapable of even low-stress work

---

[130] AR 1962–63.

[131] AR 1963.

[132] AR 1963.

[133] AR 1964.

[134] AR 1964.

because of his fatigue, that he would have good days and bad days, and that he would be absent more than 4 days a month.[135] Finally, he wrote that Plaintiff was unable to tolerate cold conditions and he was very sensitive to irritants in the air due to his lung disease.[136]

Third, on the treatment note the same day that PA-C Stiles completed the Physical Medical Source Statement discussed above, PA-C Stiles wrote:

> He really is only able to sit in one position for about 30 minutes before he starts getting muscle aches and pains that are pretty severe. He can stand for about 20 to 30 minutes. He feels very wiped out after he goes to the grocery store. He sleeps for about 4 hours before he has to change positions and adjust because he is too uncomfortable. He can walk maybe 1 to 2 city blocks before he has to sit down and rest. He has very very little stamina. He is able to lift weights but he pretty much goes into muscle exhaustion after lifting only one or 2 reps. In my opinion, based on his history, I think he is disabled. I think this has worsened his depression as well which is causing some of his memory issues. I did discuss with him that I will go ahead and follow his Social Security paperwork for his attorney and leave it at the front desk for him to pick up. I also wrote a letter for necessity stating that he really should relocate to a warmer climate during the winter months as his symptoms do seem to get significantly worse when he is exposed to cold

---

[135] AR 1965.

[136] AR 1965.

weather which would certainly be in line with his autoimmune disorder.[137]

The ALJ evaluated these three statements from PA-C Stiles. First, as to the property-tax statement, the ALJ found this statement not persuasive because it was a conclusion of disability—a determination reserved for the Commissioner—rather than a functional assessment.[138]

Second, as to PA-C Stiles' Physical Medical Source Statement, the ALJ found it unsupported by his "treatment notes where he states claimant typically presented as a healthy individual (Exhibit 33F/4)."[139] The ALJ also found the opinion "not supported by or consistent with the overall medical evidence of record noting claimant with lots of subjective complaints but generally normal to benign physical exam findings (see e.g. 41F)."[140]

---

[137] AR 1984.

[138] AR 27.

[139] AR 27.

[140] AR 27.

Third, the ALJ found PA-C Stiles' opinions expressed in his September 2023 treatment note unpersuasive.[141] The ALJ found the lifting and walking limitations were based simply on Plaintiff's reports rather than PA-C Stiles' observations and therefore were not truly a medical opinion. In addition, the ALJ found PA-C Stiles' statement, "In my opinion, based on his history, I think he is disabled" unpersuasive because it was speculative and was not a functional assessment but again a conclusion of disability.[142] Finally, the ALJ found them inconsistent with PA-C Stiles' treatment notes indicating that Plaintiff typically presented as a healthy individual.[143]

3. <u>Administrative findings as to Plaintiff's exertional abilities</u>

No other treating or examining source offered an opinion as to Plaintiff's exertional abilities. However, the record contains the prior administrative medical findings from Mark Magdaleno, MD, and Dennis Pacl, MD, dated October 21, 2021, and November 4, 2022,

---

[141] AR 27.

[142] AR 28.

[143] AR 28.

respectively. Dr. Magdaleno opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, sit for about 6 hours in an 8-hour workday, stand and/or walk about 6 hours in an 8-hour workday, had no postural limitations, no manipulative limitations, no visual limitations, no communicative limitations, and no environmental limitations other than avoiding concentrated exposure to noise due to his hearing loss.[144] Dr. Magdaleno wrote that although Plaintiff has palindromic rheumatoid arthritis, which may cause the reported chronic migratory myalgias, and interstitial lung disease the "objective findings consistently show good strength, gait, and station . . . ."[145]

Dr. Pacl agreed with Dr. Magdaleno's lifting/carrying, sitting, and standing opinions.[146] However, Dr. Pacl opined that Plaintiff was limited in each of the posturals: frequent balancing and occasional climbing ramps/stairs, climbing ladders/ropes/scaffolds, stooping,

---

[144] AR 70–77.

[145] AR 75.

[146] AR 91.

kneeling, crouching, and crawling.[147] He also opined that Plaintiff should avoid concentrated exposure to both noise and hazards.[148] Dr. Pacl noted that Plaintiffs inflammatory markers were in the normal range.[149]

The ALJ found both Dr. Magdaleno's and Dr. Pacl's opinions persuasive because 1) they supported their opinions by fully reviewing the then-available medical evidence and citing to the relevant supporting evidence, and 2) their opinions were generally consistent with the longitudinal medical evidence including treatment notes with benign exam findings, no hospitalizations, and extensive range of activities of daily living including consistent regular exercise.[150]

In evaluating Dr. Magdaleno's and Dr. Pacl's opinions the ALJ did not highlight that they reached different opinions as to Plaintiff's postural abilities. In addition, the ALJ did not discuss why he found

---

[147] AR 91.

[148] AR 92.

[149] AR 95.

[150] AR 26.

1  Dr. Magdaleno's and Dr. Pacl's opinions persuasive while also crafting

2  an RFC that was more restrictive as to postural activities than either

3  Dr. Magdaleno or Dr. Pacl opined: restricting any climbing of ladders,

4  ropes, and scaffolds, and occasional performance of all other postural

5  activities.[151]

6      4.    Analysis as to PA-C Stiles' opinion on property-tax form

7      The ALJ appropriately found that PA-C Stiles' conclusion of

8  disability on this form is not persuasive by itself, as the finding of

9  disability is reserved for the Commissioner. However, considering that

10 PA-C Stiles treated Plaintiff for the entirety of the relevant period and

11 reviewed the reports and imaging obtained from referrals to specialists,

12 PA-C Stiles' opinion in April 2022 that Plaintiff was unable to engage

13 in substantial gainful activity, even if it is conclusory, is useful to

14 consider the consistency of PA-C Stiles' subsequent opinions.[152]

15     Moreover, the ALJ failed to consider that the treatment note

16 accompanying this property-tax form states, "Certainly, with the

17 _____

18 [151] AR 22, 26.

19 [152] 20 C.F.R. § 404.1527(d).

incredibly extensive workup that he has had in regard to his rheumatological condition and his fatigue and disability, I think he is more than qualified to be considered disabled and unable to work at this time."[153] The ALJ failed to fairly and fully consider that PA-C Stiles believed that Plaintiff's rheumatological condition and fatigue severely impacted his ability to work—an opinion consistent with the more detailed findings contained in his other two statements discussed below.

### 5.    Analysis as to PA-C Stiles' medical source statement

The ALJ's finding that PA-C Stiles' September 2023 medical source statement was not supported was based solely on that PA-C Stiles' July 19, 2022 treatment note mentioned that Plaintiff typically presented as a healthy individual. However, the ALJ failed to consider the full context of this statement, which was:

> Polyarthritis inflammatory; Systemic lupus – We discussed continued follow up with Arthritis Northwest for maintenance of his new medications. Physical exam findings were unremarkable today but he does report subjective muscle fatigability. I discussed that with all of his laboratory findings showing significant autoimmune

_____

[153] AR 1621.

> processes that I would certainly support any disability claim that he may have. He typically always presents as a healthy individual *but his laboratory workup would seem to show otherwise and some of his medications that he is on certainly could lend themselves to very easy fatigability*. I discussed that continued follow up with Arthritis Northwest though would hopefully yield good results.[154]

PA-C Stiles recognized that given Plaintiff's autoimmune disorders it was not unexpected that Plaintiff could appear healthy. PA-C Stiles further recognized that Plaintiff's labs showed that he had inflammatory activity in his body and that the medications that he took to address his autoimmune disorders could cause fatigue. Therefore, the ALJ's failure to consider the full context of the PA-C Stiles' comment about Plaintiff's "healthy" presentation consequently impacted the ALJ's supportability finding.

Likewise, the ALJ's consistency analysis failed to consider that Plaintiff's symptoms related to his autoimmune conditions may not be readily observed during an appointment. Even if he presented as "healthy" or with full strength, normal gait, and no joint swelling or tenderness, Plaintiff's labs often reflected inflammatory activity in the

---

[154] AR 1608 (emphasis added).

body, and as PA-C Stiles recognized even if medication reduced the inflammatory activity, those medications could themselves cause fatigue.[155]

In addition, the treatment records reflect that during physical therapy, Plaintiff was observed with quick fatigue of scapular retraction with exercises, balance issues during physical therapy, and slight tremors in the lower extremities, or fatigue when lifting and holding objects[156]; and Dr. Butler found that Plaintiff had "developed a component of ataxia."[157]

On this record, the ALJ's consistency analysis—and overall analysis of the medical evidence—reflects a failure to fairly and fully consider the nature of Plaintiff's conditions, cause for his symptoms, and the side effects of the medications taken to treat them.

---

[155] *See* Soc. Sec. Rlg. 16-3p (allowing the medical source to consider medication side-effects and requiring the ALJ to consider medication side-effects when assessing the claimant's symptom reports).

[156] AR 783, 802, 1062.

[157] AR 1973.

6.   Analysis as to PA-C Stiles' opinions in the September 2023 treatment note

The ALJ found PA-C Stiles' lifting and walking opinions in the treatment note unsupported because they were based on Plaintiff's self-reports rather than any observed limitations in these areas by PA-C Stiles. However, again, the ALJ failed to consider that PA-C Stiles met with and evaluated Plaintiff over several years and had reviewed labs showing positive inflammatory processes, biopsies consistent with small fiber neuropathy, physical therapy records showing observed tremors and muscle fatigue, and imaging showing bilateral basal ganglial and caudate head calcifications and interstitial lung disease. Instead of discussing these findings or that PA-C Stiles believed that Plaintiff's autoimmune-disorder medications caused fatigue, the ALJ focused on that PA-C Stiles had not observed lifting or walking limitations himself. Given the overall treatment record, the ALJ failed to meaningfully explain why PA-C Stiles' lifting and walking limitations are not supported by the medical evidence.

Finally, although the ALJ reasonably did not adopt PA-C Stiles's conclusory statements that Plaintiff is disabled, the ALJ's evaluation of the medical evidence and opinions should have considered that PA-C Stiles found Plaintiff's overall conditions to be extremely limiting. Moreover, the ALJ failed to mention that treating neurologist Dr. Pugh stated: "Based on what I am seeing the degree of his anxiety surrounding his condition is so extreme that I do not see how he could ever possibly work and that may be a primary disorder of his as well."[158]

## B.    Other Steps: The ALJ must reevaluate on remand.

The ALJ's errors when evaluating PA-C Stiles' medical opinions impacted her sequential analysis, including her evaluation of Plaintiff's reports of internal shaking, severe fatigue, intermittent shortness of breath, balance issues, wrist pain, and muscle paralysis with repetitive movements. Remand is required. Furthermore, development of the record requires an extended functionality capacity evaluation be performed to test Plaintiff's functional abilities with repeated

---

[158] AR 1635.

activity.[159] Such an evaluation is needed on this record given Plaintiff's observed muscle intolerance and balance issues during physical therapy and the comments by treating providers that his autoimmune-disorder medication can cause fatigue.

## IV.    Conclusion

Plaintiff establishes the ALJ erred. The ALJ is to develop the record and reevaluate—with meaningful articulation and evidentiary support—the sequential process.

Accordingly, **IT IS HEREBY ORDERED**:

1.    Plaintiff's Motion for Summary Judgment, **ECF No. 10**, is **GRANTED**.

2.    The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social**

---

[159] 20 C.F.R. §§ 404.1519a, 404.1517. *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) ("The ALJ always has a special duty to fully and fairly develop the record" to make a fair determination as to disability, even where, as here, "the claimant is represented by counsel." (cleaned up)).

1  **Security for further proceedings pursuant to**

2  **sentence four of 42 U.S.C. § 405(g)**.

3  3.  The Clerk's Office shall **TERM** the Commissioner's brief,

4  **ECF No. 12**, enter **JUDGMENT** in favor of **Plaintiff**, and

5  **CLOSE** the case.

6  IT IS SO ORDERED. The Clerk's Office is directed to file this

7  order and provide copies to all counsel.

8  DATED this 27th day of January 2026.

9  _Edward F. Shea_

10  ————————————————
     EDWARD F. SHEA
     Senior United States District Judge

11

12

13

14

15

16

17

18

19